Linda CAMPBELL, Appellant,

v.

The STATE of Texas, Appellee.

Homer Clifton CAMPBELL, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 3–82–174–CR(T), 3–82–175–CR(T).

Court of Appeals of Texas,
Austin.

Dec. 15, 1982.

Stephen M. Orr, Austin, (Retained), for appellants.

Edward J. Walsh, Dist. Atty., Georgetown, for appellee.

Before SHANNON, POWERS and GAMMAGE, JJ.

POWERS, Justice.

Homer Clifton Campbell and Linda Campbell appeal their conviction for aggravated robbery. Tex.Pen.Code Ann. art. 29.-03 (1974). The jury assessed punishment of thirty years imprisonment. We affirm the judgment of the trial court.

■ Appellants contend the trial court erred in overruling their objection to the State's introduction of incriminating evidence discovered in the search of a motor vehicle in which appellants were riding when stopped by a police officer, a stop which led to appellants' arrest. In a corollary ground of error, appellants complain that the trial court overruled their motion to suppress the same evidence. Appellants contend the warrantless search of the motor vehicle was initiated without probable cause in violation of the Fourth Amendment of the Constitution of the United States and Article 1, § 9 of the Constitution of the State of Texas.[1] The arrest of appellants and the search of their motor vehicle concluded the series of events next to be described.

Three men and a woman robbed a Safeway store in the City of Georgetown, Williamson County, Texas, at approximately 11:45 p.m. on October 23, 1977. The store lies adjacent to Interstate Highway 35. The manager of the store, having had ample opportunity to observe the robbers, called the Georgetown police department on the telephone immediately upon the robbers' leaving. She did not see them leave in a motor vehicle, and so informed the police; she did, however, give the police a description of their persons, based upon which the police dispatcher, at approximately 11:55 p.m., broadcast the fact of the armed robbery by four individuals described as follows:

---

1. The Fourth Amendment to the Constitution of the United States provides as follows:

 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and No Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

 U.S. Const., amend. IV.
 Article I, § 9 of the Constitution of the State of Texas, provides as follows:

 The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation.

 Tex. Const. art. I, § 9 (1955).
 The test of probable cause for a warrantless arrest is "at least as stringent as the standards applied with respect to the magistrate's assessment" as a prelude to issuing an arrest or search warrant. *Whiteley v. Warden,* 401 U.S. 560, 566, 91 S.Ct. 1031, 1035, 28 L.Ed.2d 306 (1971).

(1) a white male with blond hair, wearing a striped shirt;

(2) a white male with blond hair, wearing a brown leather jacket;

(3) a white male with blond hair; and

(4) a white female with blond hair, wearing a red coat or blouse.

Two peace officers, Aleman and Davis, situated in different nearby locations, heard the broadcast. Officer Aleman immediately contacted the dispatcher by radio, inquiring whether the robbers had been seen leaving the store in a motor vehicle. On being told that no one had seen them leave by motor vehicle, Officer Aleman told the dispatcher that he "had seen a vehicle parked in the parking lot (which he) thought could possibly be connected with the armed robbery." He described the automobile as a late model Ford van which he had seen at 11:45 p.m., the time of the robbery, "backed up to the store" with its front "headed out" or facing the parking lot exit. The van was two-toned in color, either dark blue or dark green, the top being lighter in color than the bottom, and had tinted windows and high bucket seats in front. He had not noticed whether anyone was in the van when it was parked in front of the store. As a result of Officer Aleman's report, the dispatcher made a second broadcast, at approximately 12:00 a.m., giving a description of the van based upon Officer Aleman's description.

Officer Davis, on hearing the first broadcast, drove his police automobile on to Interstate Highway 35 at a point seven to ten miles south of Georgetown. While driving north toward Georgetown, he stopped a passenger automobile travelling at a speed of 99 miles per hour. In a transaction which consumed only a "couple" of minutes, he issued a citation to the driver for speeding; the driver and the occupants of the automobile being black, Officer Davis allowed them to leave. Continuing his drive toward Georgetown, Officer Davis heard the second broadcast at 12:00 a.m. Immediately seeing a van in the opposite or southbound lane, he flashed his spotlight on it, saw that it was two-toned and dark green

in color, turned off his spotlight, crossed the median, and commenced to follow the van. While doing so, he noticed the van being driven in an erratic manner and "real close to or on the right hand shoulder of the highway" and that "its brake lights came on a couple of times." Then, the van was driven so far off the traffic lane as to almost hit a guardrail. Thinking the van might be the one used in the robbery and that some object had been thrown from the van or that it was being operated by an intoxicated driver, Officer Davis turned on his red light to signal the driver to stop.

The van stopped. Officer Davis left his police automobile, unstrapping his holster and placing his hand on his revolver but not drawing it. As he walked toward the van, the blond male driver of the van got out and walked toward Officer Davis, who instructed him to remain in the area between the police automobile and the van. At trial Officer Davis identified the driver as the appellant, Homer Clifton Campbell.

Officer Davis walked to the van and attempted to look through the windows. Being unable to see the interior because of the heavy tinting, he opened the door on the driver's side of the van and saw that it contained three passengers, one of whom, a white female, was sitting in one of the two bucket seats in front, and two of whom were white males sitting on seats behind the front seats. At trial Officer Davis identified the female as the appellant, Linda Campbell.

Officer Davis ordered the three passengers to come out with their hands in view. When they did, he saw that the males were blond, the female was brown-haired, and their clothing did not exactly match the clothing described in the broadcast. Nevertheless, he ordered the passengers to join the driver between the motor vehicles, directing all four to seat themselves on the guard rail with their hands in their laps where he could see them. In a radio message shown to have been made at 12:12 a.m., he requested assistance from any other peace officers within hearing.

Within a minute or so, two other officers arrived. One of them, joined by Officer Davis, entered the van looking for weapons and "contraband." They found a briefcase containing a large sum of money, a revolver, a red blouse, a blond wig, a brown jacket, two gun holsters, and a Safeway mail container. The following morning, investigating officers found at the scene three automatic pistols, lying in a position consistent with their being thrown from the van as it was driven close to the guardrail. The foregoing articles were introduced over appellants' objection.

 The following statutes, contained in the Texas Code of Criminal Procedure, are applicable to the events described above.

Art. 14.03. Any peace officer may arrest, without warrant; (a) persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony or breach of the peace . . . .

Art. 14.04. Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused.

Art. 14.05. In each case enumerated where arrests may be lawfully made without warrant, the officer or person making the arrest is justified in adopting all the measures which he might adopt in cases of arrest under warrant.

Art. 15.22. A person is arrested when he has been actually placed under restraint or taken into custody by an officer . . . .

Art. 38.23. No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

Tex.Code Cr.P.Ann. arts. 14.03 (Supp.1981); 14.04, 14.05, 15.22 (1977); 38.23 (1979). The foregoing statutes are, of course, limited and illuminated by the judicial decisions presently to be discussed. We find the search described above to have been lawful and within the limits of the rules prescribed for warrantless searches of automobiles, whether as an incident to a lawful custodial arrest or as a search based upon probable cause in circumstances making it impracticable to secure a warrant. *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *United States v. Ross,* —— U.S. ——, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). We turn first to the rules enunciated in *Belton,* wherein the Court applied the principles of *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) relating to searches incident to a custodial arrest.

 An arrest, whether effectuated with or without a warrant, must be predicated upon "probable cause." To determine whether the predicate exists, one must appraise the material facts and circumstances and evaluate whether the basis for the arrest was merely an inarticulate hunch, suspicion, or good faith belief that the person to be arrested has committed an offense; or whether, on the other hand, the arrest was based upon the personal observations of the arresting officer or upon reasonably trustworthy information supplied to him by others, sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed by the individual to be arrested. *Brinegar v. United States,* 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949). It is therefore plain that "probable cause" is not itself a fact required to be shown by the evidence; rather, it is a conclusion which may or may not be reasonably deduced from all the circumstances made by the facts adduced. Moreover, the conclusion is permitted to be drawn only in terms of "probabilities" and not "certainties." As the Court said in *Brinegar:*

> In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. [*Id.,* at 175, 69 S.Ct. at 1310.]

Implicit in the foregoing is the proposition that "probable cause" may exist for an arrest even when the evidence from which that conclusion was drawn is less than that required for conviction. *Id.*

These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice. [*Id.*, at 176, 69 S.Ct. at 1311].

One should bear in mind, as the facts of the present case illustrate, that not every transaction between a policeman and an individual amounts to an "arrest," even if a brief detention of the individual results; "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of *investigating* possibly criminal behavior *even though there is no probable cause to make an arrest.*" *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (emphasis supplied). An officer may, for example, direct a motorist on the highway to stop, not for the purpose of searching the vehicle or to effectuate the driver's arrest but to question him briefly, to request identification, to determine if the driver requires assistance, or for a number of other reasons. When a police officer stops a motor-vehicle operator on the basis of his possible complicity in a criminal offense, however, even a temporary detention falling short of a custodial arrest depends for its validity upon the presence of probable cause, albeit a form of probable cause allowing a far larger element of uncertainty in light of the mildness of the detention. In lieu of a reasonably grounded belief that the individual has committed an offense, as would be required for a custodial arrest, a brief investigative detention is sufficiently reasonable, and therefore based upon probable cause, when based upon all the circumstances ascertained by "objective observations, information from police reports, ... and consideration of the modes or patterns of operation of certain kinds of law breakers," considered in light of a trained peace officer's reasonable inferences and deductions, the "whole picture" yields a *"suspicion* that the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (emphasis added). Irrespective of Officer Davis's authority to stop the van because of its erratic operation, we hold that his decision to stop the van for possible complicity in the armed robbery was a decision which issued from a judgment formed in the requisite manner under *Cortez.*

Officer Aleman's observation of the van at the scene of the crime, at the time of its commission, parked in a manner facilitating a rapid flight from the store, raised no more than a hunch or suspicion that it may have been utilized by the robbers, as pointed out by appellants. Nevertheless, Officer Davis possessed this information as a result of the first broadcast—information which, however tenuous, linked a specifically described motor vehicle with the time and place of the robbery. The van could *possibly* have been used by the robbers, as could any number of other motor vehicles parked near the store at the time. We find it reasonable that on sighting a van of the description contained in the broadcast, Officer Davis crossed the highway median to pursue it, for he quite obviously possessed from personal knowledge, inference, and deduction the following information: (a) the van was travelling away from the city where the robbery occurred,

on the main highway artery adjacent to the store, and was sighted by him about 25 minutes after the robbery at a place seven to ten miles from the store, that is, the van was within the possible range or radius of flight; and (b) while the individuals who committed the robbery were not reported to have left the store in a motor vehicle, one would be reasonable in assuming the possibility that their flight was continued by means of a motor vehicle using a likely course of flight, such as Interstate Highway 35. And from his personal observations, Officer Davis saw the van driven close to the guardrail, causing him to think "they're (sic) throwing some object out of the vehicle or . . . it must be a DWI," following which he turned on his red light to stop the van; moreover, on crossing the median, he saw the van being operated in an "erratic" manner, which manner of operation continued until he signaled the van to stop, which would be a reasonable action on his part for that reason alone.[2] One may reasonably conclude, therefore, that the "whole picture" contained sufficient facts and circumstances to "raise a suspicion that the particular individual being stopped (was) engaged in wrongdoing." *United States v. Cortez, supra,* at 418, 101 S.Ct. at 695. No more than a reasonably grounded suspicion was required in order to afford Officer Davis probable cause to stop the van for investigation, whether in connection with the robbery or erratic driving.[3]

■ The events which followed Officer Davis's stopping the van were of a nature to lend credence to his suspicion that the van may have been used in the robbery, and justified his pursuing the investigation further in that regard. He saw, for example, that the driver of the van was a blond, white male. Being unable to see through the windows of the van, he opened the front door on the driver's side and saw three passengers who in gender, race, and hair color matched the physical description of the robbers, save for some discrepancies in clothing and the color of the female's hair. He ordered the passengers to leave the van and join the driver. All were instructed to seat themselves on the guardrail with their hands in view.

■ We conclude that appellants were not free to go when they were instructed to seat themselves on the guardrail with their hands in their laps, and were therefore in custodial arrest. Tex.Code Cr.P.Ann. art. 15.22; *cf., New York v. Belton, supra.*

■ In connection with his investigative stop of the van, Officer Davis was entitled to pursue his investigation sufficiently to assure his own safety. While he was not entitled to search the van, he was entitled in these circumstances to determine if it contained passengers who were armed. He was not required to be absolutely certain that the van contained the armed robbers described in the radio broadcast; it was sufficient that a reasonably prudent person in the circumstances would assure himself of personal safety by determining whether the van, into which he could not see, contained other individuals who might be armed. We hold, therefore, that Officer Davis's opening the door of the van was not in these circumstances an unreasonable expansion of the scope of his investigation. *Tardiff v. State,* 548 S.W.2d 380 (Tex.Cr. App.1977); *Perez v. State,* 548 S.W.2d 47 (Tex.Cr.App.1977); *Milton v. State,* 549 S.W.2d 190 (Tex.Cr.App.1977); *Wood v. State,* 515 S.W.2d 300 (Tex.Cr.App.1974); *Lewis v. State,* 502 S.W.2d 699 (Tex.Cr.App. 1973).

■ When Officer Davis saw that the number, gender, and hair color of the driver

---

2. See 3 LaFave, Search and Seizure (1978), at 82–94 for a similar discussion of such factors and examples of how they may coalesce to form, from all the facts and circumstances, probable cause for making an investigative stop.

3. That Officer Davis would have stopped the van based upon his suspicion that it may have been used in the robbery, irrespective of its erratic operation, is immaterial, for the test for probable cause, is *objective* reasonableness and not motive. *Scott v. United States,* 436 U.S. 128, 139 & n. 13, 98 S.Ct. 1717, 1724 & n. 13, 56 L.Ed.2d 168 (1978).

and occupants largely matched those of the robbers, as described in the broadcast, reasonable suspicion under the objective facts and circumstances justifiably evolved into a reasonable belief, under *Brinegar,* that he had before him the robbers of the Safeway store, absolute certainty not being required and notwithstanding that more would be required for conviction. See *Walker v. State,* 555 S.W.2d 454, 456 (Tex.Cr.App. 1977) and *Guzman v. State,* 521 S.W.2d 267, 269 (Tex.Cr.App.1975), each of which concludes that probable cause to arrest existed in similar circumstances.

▇ As an incident to the custodial arrest of appellants, Officer Davis was authorized to conduct a warrantless roadside search of the van for weapons and evidence of the robbery under the decision in *New York v. Belton, supra.* Whether a custodial arrest was effectuated before the search, or not, we hold he was also authorized to search the van for evidence that the defendants committed the robbery, based upon probable cause inferred from the facts and circumstances described heretofore. *United States v. Ross, supra.*

We overrule appellants' grounds of error founded upon an allegedly invalid search of the van.

Appellants next complain that the trial court erred in overruling their motion for mistrial, a motion based upon the death of a juror which occurred after the jury returned a finding of guilty and while the parties were presenting evidence in regard to punishment. The hearing on punishment continued before the eleven remaining jurors, each of whom concurred in the punishment the jury assessed and signed the verdict.

Our state constitution provides that petit juries shall be composed of twelve men; and when one or more of them, not exceeding three, shall die pending the trial of a case, the remainder shall have the power to render a verdict in the case; "provided, that the Legislature may change or modify the rule authorizing less than the whole number of the jury to render a verdict." Tex. Const.Ann. art. V, § 13 (1955). In an exercise of that power, the Legislature enacted Tex.Code Cr.P.Ann. art. 36.29, which at the time of trial provided:

Not less than twelve jurors can render and return a verdict in a felony case. It must be concurred in by each juror and signed by the foreman; provided, however, when *pending the trial* of any felony case, one juror may *die* or be *disabled from sitting* at any time *before the charge of the court* is read to the jury, the remainder of the jury shall have the power to render the verdict; but when the verdict shall be rendered by less than the whole number, it shall be signed by every member of the jury concurring in it. *After the charge of the court is read* to the jury, if any one of them becomes so *sick* as to prevent the continuance of his duty, or any *accident of circumstance occurs to prevent their being kept together* under circumstances under which the law or the instructions of the court requires that they be kept together, the jury *may* be discharged.

1965 Tex.Gen.Laws, ch. 722, § 1, at 460 (emphasis added).

▇ The present case was "pending" from the moment the jury were selected and sworn to try the cause. See *Thomas v. Billingsley,* 173 S.W.2d 199 (Tex.Civ.App. 1943, writ ref'd), construing an analogous provision, Tex. Const. art. V, § 13, applicable to both civil and criminal cases, and Tex.R.Civ.P.Ann. 292, applicable to civil cases; *Johnson v. State,* 525 S.W.2d 170 (Tex.Cr.App.1975), adopting the rule of the *Billingsley* case in construing art. 36.29. For the purposes of art. 36.29, the trial ceased to be a "pending" trial from the moment the jury's verdict on punishment was entered upon the minutes of the court, there being nothing further for the jury to decide thereafter. *Smalley v. State,* 59 Tex.Cr.R. 95, 127 S.W. 225, 226 (1910) (The word "pending," legally speaking, means a matter undecided.); Tex.Code Cr.P.Ann. arts. 37.04, 37.07, § 3(c) (1981).

From a premise that art. 36.29 was intended by the Legislature to require a mistrial if a juror died after submission of the

charge, on a theory that the dead juror might have been a persuasive advocate in favor of the accused, a speculative theory in any event, and reasoning that a bifurcated trial under art. 37.07 of the Code requires two charges to the jury, one on guilt or innocence and one on punishment, appellants conclude that the word "charge" as used in art. 36.29 refers exclusively to the charge on guilt or innocence; and, the circumstances of the present case do not, therefore, fall within the exception allowed by art. 36.29 for cases where a juror dies "before the charge is read to the jury." Therefore, they argue, the statutory mandate for twelve jurors remained in full force and effect in the present case and the eleven jurors who returned a verdict relative to punishment were without power to do so.

Article 36.29 has not previously been judicially interpreted in the context of a juror's death or disability intervening between the jury's finding of guilty and before they receive the trial judge's instructions relative to proper punishment, in a felony case where they are required to assess punishment.

◼ We will assume, for the purposes of discussion, that the Code contemplates two "charges" to the jury in a bifurcated trial. We think it rather plain, however, that the Legislature authorized the jury to return a verdict, although reduced to eleven, not to confer a right upon the accused but to avoid the time and expense of the mistrial which would otherwise result from the requirement of twelve jurors, and this object of judicial efficiency is equally applicable when the juror dies or becomes disabled before the jury are instructed on guilt or innocence or before they are instructed on

the issue of punishment. See Reid, *The Texas Code of Criminal Procedure,* 44 Texas L.Rev. 983, 985, 1008 (1966). For example, art. 36.29 does not *compel* that the jury be discharged when a juror dies or becomes disabled before the charge is read to the jury, as would be the case if the Legislature had intended to confer a right upon the accused. Rather, article 36.29, by specifically empowering the remaining eleven jurors to render a verdict, clearly shows that the Legislature intended that the decision to continue the trial before eleven jurors be a matter resting in the sound discretion of the trial judge, as is his determination of whether a juror's disability is sufficient to prevent his sitting in the case. See *Daniels v. Southwestern Transportation,* 621 S.W.2d 188 (Tex.App.1982, no writ), construing Tex.R.Civ.P.Ann. 292 (1977), an analogous provision applicable in the trial of civil cases.

Moreover, we disagree with appellants' deduction that the word "charge," as used in the phrase "before the charge of the court is read to the jury," in the second sentence of art. 36.29, refers *solely* to those instructions of the trial judge relating to the issue of guilt or innocence.

From a comparison with former statutory provisions, as set out in the 1948 Code of Criminal Procedure, it is obvious that art. 36.29, after first reaffirming the constitutional, statutory, and common law rule that ordinarily only a jury of twelve are empowered to render and return a verdict in a felony trial, proceeds to address two different kinds of contingencies which may disrupt the trial.[4] The statute, one observes, provides a remedy for the disruption arising from the first contingency and directs the result when the second arises.

4. Before enactment of the present Code of Criminal Procedure in 1965, the 1925 Code, as amended, contained the following provisions which touched upon some of the matters necessary to be considered in assigning the proper meaning to art. 36.29:

Art. 578. Jury; when of twelve, when of six.—In the district court, the jury shall consist of twelve men; in the county court and inferior courts, the jury shall consist of six men.

Art. 623. Jurors shall not separate.—The Court may adjourn veniremen to any day of the term. In felony cases when jurors have been sworn in a case, those so sworn shall be kept together and not permitted to separate until a verdict has been rendered or the jury finally discharged; ...

Art. 668. Separation of jury.—After the jury has been sworn and impaneled to try any felony case, they shall not be permitted to separate until they have returned a verdict, unless by permission of the court, with

The first contingency is the reduction in the number of jurors from twelve to eleven, occasioned by the death or disability of a juror occurring *before* the charge is read to

the consent of the attorney representing the State and the defendant, and in charge of an officer.

Art. 669. Separation in misdemeanor.—In misdemeanor cases the court may, at its discretion, permit the jury to separate before the verdict, after giving them proper instructions in regard to their conduct as jurors while so separated.

Art. 680. If a juror becomes sick.—After the retirement of the jury in a felony case, if any one of them becomes so sick as to prevent the continuance of his duty, or any accident or circumstance occurs to prevent their being kept together, the jury may be discharged.

Art. 681. Discharging jury in misdemeanor. —If nine of the jury can be kept together in a misdemeanor case in the district court, they shall not be discharged. If more than three of the twelve are discharged, the entire jury shall be discharged.

Art. 686. Verdict.—A verdict is a written declaration by a jury of their decision of the issues submitted to them in the case.

Art. 687. Verdict in felony.—Not less than twelve jurors can render and return a verdict in a felony case. It must be concurred in by each juror and signed by the foreman.

Art. 688. Verdict by nine jurors.—In misdemeanor cases in the district court, where one or more jurors have been discharged from serving after the cause has been submitted to them, if there be as many as nine of the jurors remaining, those remaining may render and return a verdict; but, in such case, the verdict must be signed by each juror rendering it.

Tex.Code Cr.P. arts. 578, 623, 668, 669, 680, 681, 686, 687, 688 (1925). Article 623 was amended by 1955 Tex.Gen.Laws, ch. 288, § 3, at 796.

Under the 1925 Code, the trial court instructed the jury in one "final charge" which distinctly set forth the law applicable to the case. After argument began, no further instructions to the jury were permissible "unless required by the improper argument of counsel or the request of the jury, or unless the judge shall, in his discretion, permit the introduction of other testimony." Tex.Code Cr.P. arts. 658, 660 (1925); art. 658 was amended by 1931 Tex.Gen.Laws, ch. 43, § 5, at 65–67. The jury's verdict was required to find the accused "guilty" or "not guilty," where his plea was not guilty; to answer "true" or "untrue" to any special plea; and to "assess the punishment in all cases where the same is not absolutely fixed by law to some particular penalty." Tex.Code Cr.P. art. 693 (1925).

The 1965 Code of Criminal Procedure preserved the requirement of twelve jurors in district court trials and six in the county court and inferior courts. Tex.Code Cr.P.Ann. art. 33.01 (1966). The former provisions as to the separation of jurors were changed and the following provided in art. 35.23.

> The court may adjourn veniremen to any day of the term. When jurors have been sworn in a felony case, the court may, at its discretion, permit the jurors to separate until the court has given its charge to the jury, after which the jury shall be kept together, and not permitted to separate . . . until a verdict has been rendered or the jury finally discharged, unless by permission of the court with the consent of each party. . . . In misdemeanor cases the court may, at its discretion, permit the jurors to separate at any time before the verdict. In any case in which the jury is permitted to separate, the court shall first give the jurors proper instructions with regard to their conduct as jurors when so separated.

Tex.Code Cr.P.Ann. art. 35.23 (1966).

The 1965 Code also preserved the provisions of former articles 658 and 660 relating to the court's charge to the jury, and the provisions of article 693 relating to the verdict of the jury. 1965 Tex.Gen.Laws, ch. 722, arts. 36.14, 36.16, 37.07, § 1, at 456, 457, 462. However, the 1965 Code provided an "alternate procedure" allowing a separate hearing on the proper punishment to be assessed in a felony case less than capital and in a capital case where the State did not seek the death penalty, requiring the trial judge to "give such additional written instructions as may be necessary" following the introduction of evidence bearing on the matter of punishment. 1965 Tex.Gen.Laws, ch. 722, art. 37.07, § 2, at 462. The 1965 Code combined the provisions of former articles 680 and 681 and added an exception to the general requirement of twelve jurors in a district court felony case, as it was authorized to do by the provisions of article V, § 13 of the Constitution of the State of Texas. These were set forth in art. 36.29, which provided as follows:

> 1. "Not less than twelve jurors can render and return a verdict in a felony case," [a provision copied from former article 687 stating the number of jurors empowered to render and return a verdict in a felony trial.].
> 2. "[P]rovided, however, when pending the trial of any felony case, one juror may die or be disabled from sitting at any time before the charge of the court is read to the jury, the remainder of the jury shall have the power to render the verdict." [an entirely new provision not contained in the former Code, but still one expressly directed at the power of the jury to render and return a verdict.].

the jury. By empowering the remaining eleven to render and return a verdict, the Legislature sought to serve the interest of judicial efficiency, evidently believing that no injustice would be caused by so slight a departure from the twelve jurors ordinarily required. The second contingency is the creation of a state of affairs, occasioned by a juror's sickness, an accident, or other circumstance occurring *after* the charge is read to the jury, wherein it becomes impractical to keep the jury together. By directing the discharge of the jury in such circumstances, the Legislature sought to enforce Tex.Code Cr.P.Ann. art. 35.23 (1966) which requires the jury to be kept together after the charge is read except under certain circumstances, and provides a procedure for avoiding the injustice which potentially exists in the jury's separation.

By referring to the "charge" of the court in art. 36.29, the Legislature evidently intended to address the ordinary case where the jury, in response to one set of instructions encompassing the issue of guilt or innocence, special pleas, and punishment, returned a single verdict responding to each of the foregoing with appropriate findings. Nevertheless, the same Legislature which composed art. 36.29 in the form with which we are here concerned also provided an entirely new trial procedure whereby the accused, at his election, might have a separate hearing on the issue of punishment, in the event he was found guilty, coupled with the exclusion of evidentiary matters from the first hearing which, while appropriate on the issue of punishment, were distinctly disadvantageous to him if adduced before the jury previous to their considering his guilt or innocence. Art. 37.07. Therefore, the provision for such separate hearings is a valid and subsisting provision which the Legislature must have considered to be in harmony with art. 36.29, a harmony which we must find and enforce if it may reasonably be done.

■ One may arguably insist, as appellants do, that the word "charge," as used in art. 36.29 is susceptible of meaning either the trial court's instructions to the jury on the issue of guilt or innocence, or its instructions on the issue of punishment; that is to say, the article does not specify which "charge" is intended in the phrase, "before the charge is read to the jury." From this premise, appellants argue *a priori* that "charge" means the first set of instructions, that is, those relating to guilt or innocence. While appellants' argument is possible in the abstract, and within the confines of art. 36.29, it fails when, as we must do, we interpret the quoted phrase in light of the other code provisions of which art. 36.29 is a constituent part. When we do so, we find we may harmonize the provision for bifurcated trials with art. 36.29 simply by holding that the word "charge," as used in that article, means the last set of instructions given to the jury by the trial court, because it was the evident purpose of the Legislature to prevent mistrials due to the death or

3. "After the charge of the court is read to the jury, if any one of them becomes so sick as to prevent the continuance of his duty, or any accident of [sic] circumstance occurs to prevent their being kept together under circumstances under which the law or the instructions of the court requires that they be kept together, the jury may be discharged." [Aside from the substitution of the word "of" for the word "or" following the word "accident," an evident mistake, this portion of article 36.29 is identical to former article 680, except for the added provision referring to a law or instructions of the court which required the jury be kept together, an obvious accommodation for the change made in former Code provisions allowing separation of the jury, after submission of the case to them, on agreement of the parties, but maintaining in force the requirement that they not separate absent such agreement. *Cf.*, arts. 623 and 668 of the 1948 Code and article 35.23 of the 1965 Code.].

1965 Tex.Gen.Laws, ch. 722, art. 36.29, at 460. Appellants were tried under the version of art. 36.29 which was in effect before a 1981 amendment which became effective June 12, 1981. 1981 Tex.Gen.Laws, ch. 545, § 2, at 2264. The amendment did not alter any of the provisions discussed herein; it did, however, make provision for alternate jurors in a capital case. Curiously, it repeated the rather obvious typographical error which in 1965 had resulted in the word "of" replacing the word "or" used in the 1948 Code in the provision relating to "any accident or circumstance."

disability of a juror, rather than to create new and additional occasions for their occurrence as would be the case under appellants' arguments.

 And even if the Legislature's intention is not altogether clear, as appellants contend, the same result is compelled, for "in such instances the courts must resort to rules of construction to give meaning to legislative enactments." *State v. Shoppers World, Inc.*, 380 S.W.2d 107, 111 (Tex.1964). In making reference to such rules of construction, we are permitted, of course, to assume that a just and reasonable result was intended by the Legislature in its enactment of art. 36.29, particularly in its language relating to the reading of the charge to the jury. Moreover, we may consider the object sought to be obtained; the provisions of the common law or former statutes relating to the same subject; the consequences of a particular construction; and statutes *in pari materia.*

We find no injustice to the appellants when we construe the word "charge" to mean the last set of instructions given to the jury by the court. The latent ambiguity becomes real in the present case solely because appellants exercised a long-standing statutory right to have the jury assess punishment, coupled with a rather recent statutory right to prevent the jury's being informed of matters which might bear on a proper punishment but which might influence them, adversely to appellants, on the issue of guilt. Reid, *supra*, at 1008–10. A separate hearing on punishment was created by the Legislature, and made dependent upon an accused's election, to protect him from injustice. Moreover, if any prejudice to defendant results from a reduction of the jury from twelve to eleven, it is no greater on the issue of punishment than on the issue of guilt, and was considered by the Legislature to be outweighed by the increment of judicial efficiency attained by empowering eleven jurors to render a complete verdict in a felony case. We point out, however, that any claim of injustice is pure speculation, for the dead or disabled juror might, with equal probability, have been a persuasive advocate for the prosecution. For the same reasons, we conclude that reasonableness rests upon the side of construing the word "charge" to include the last instruction delivered by the court to the jury, that is, the instructions as to punishment in the present case. In contrast to the justifications which support this interpretation of the word "charge," the contrary interpretation rests merely upon the abstract proposition that the word "charge" is reasonably susceptible of meaning the trial court's instructions to the jury on the issue of guilt, a meaning made reasonable, of course, by the definition in Tex.Code Cr.P.Ann. art. 36.14 (Supp.1981) when applied to the ordinary case, but a meaning somewhat deprived of reasonableness when considered in the context of the application of art. 36.29 to the facts of this case.

Finally, having reference to the object to be obtained in the Legislature's enactment of art. 36.29, we observe that judicial efficiency is served by the meaning we assign to the word "charge" and undermined by the meaning contended for by appellants; and considering former statutory provisions and current provisions *in pari materia,* our meaning results in harmony while that contended for by appellants has the opposite result.

 We therefore overrule appellants' ground of error, believing the juror had died "before the charge [was] read to the jury," within the meaning of art. 36.29.

Having considered appellants' other grounds of error, we find they are without merit. Consequently, they are overruled and the judgment of the trial court is affirmed.

Affirmed.